at all? Are you in service with a fee of $15.05? Mr. Wilson, will you please come forward? Your Honors, I will reserve four minutes for rebuttal. Your Honors, it's my pleasure to represent Superior Production Partners, known as PBSI, and that's how I'll refer to them in the course of this argument. I'm going to first address the errors made by the District Court in granting summary judgment, and then, to the extent my time permits, move to the discovery errors here. As shown by our briefs, there are numerous bases to reverse Judge Smith's decision below, but the simplest is that he misread this Court's decision in Spirit Airlines regarding both the standards for summary judgment and the standards by which we judge whether prices are below cost in a predatory pricing case. We believe that in granting summary judgment, he ignored Spirit Airlines' admonition. What do you say the standard is as it relates to predatory pricing and how you figure cost? Your Honor, I... Obviously, you've got to figure cost in there somewhere. Sure. And this is a challenge that all courts in the predatory pricing cases have faced. I think that the Sixth Circuit sent an appropriate test here. First of all, if you can show that prices are below average variable costs, then the presumption is that you've established your predatory pricing claim, and it's up to the defendants to rebut that with evidence. Variable costs simply means fixed costs plus what? Well, actually, removing the fixed costs from the calculation, and so just the cost for that unit of production. And that's why this is so difficult in the evidentiary sense because accounting systems don't account for things the way economists do. And that's one of the reasons, as I'll get to, that the discovery errors here were so crucial is that Gordon wants to argue, well, just take our public accounting records on cost. Well, that's not what economists look for in cost. But to get back to your question, Judge Merritt, when you're looking at average variable costs, you're basically looking at that additional unit of production. But this court in Spirit Airlines said there's another area, and that is where you're below average total costs for the unit. Then the burden doesn't shift. It's still my client's burden to show there's other evidence of predatory intent here, and we believe that we succeeded in that. Let me see if I understand it. Even though you can show pricing below total costs per unit, you also have to show an added element of coercion or something. What would you call it? I wouldn't call it coercion, Your Honor. Here I would call it collusion. It depends. You know, antitrust cases are remarkably fact-specific, and that's one of the… Show an agreement of some kind that is collusive. Or that would lead to a collusive agreement that would make the predatory pricing economically sensible. I mean, that's when the Supreme Court narrowed the rules around predatory pricing. It was dealing with a situation in which there was no allegation of collusion in the Brook Group case. It was simply dealing with a cigarette manufacturer that, in a product line, had lowered its prices. It said for a unilateral actor, a single… You've got to show some kind of intent. Is that what this extra element is that you've got to show? In addition to a price below total costs, you've got to show, in addition, some intent to restrain commerce. Yes, Your Honor, but I want to be clear that when we're talking about intent in the antitrust context, we're looking at economic motives. And that was a primary error that Judge Smith below made, was that we offered standard economic testimony using the no economic sense test. And the judge, applying Daubert, excluded that testimony and said that he would not consider that in the summary judgment proceeding. And I would like to… Okay. Okay, I just want to go back to the fundamental, I guess, baseline cost analysis. You talked about the average cost and then the total cost. And I know some of the components that would be in total cost that aren't in the average cost of production. What are the… When you put those side by side, what other costs are we looking at in this analysis? Sure. So the total costs would include costs that, from an accounting perspective, typically don't change depending on how many units you produce. So what it costs you to heat your plant, what the labor costs are that you don't attribute to specific units of your production, what your overall sales costs are, what your costs of capital are. The total cost criteria would not be a part of this cost predation issue that we're looking at. We believe… It would not influence in a determination regarding the price fixing analysis that we're looking at. If we were in a case where the evidence was undisputed that Gordon's prices were above their total costs, we would concede that we would lose under the Spirit Airline test. Our argument is that when you take our economist's report and read that in the totality of the evidence, we've raised a genuine issue of material fact that we are…that their prices were below total costs. We didn't have sufficient data due to, we believe, the limits that were placed on us in discovery to get to whether they were below the variable costs. So we believe that there's at least a genuine issue… Can you, in answering her question that relates to the question, what is the difference exactly between how you figure total costs and variable costs? Well, essentially, you add other components into total costs. So you're looking at components like what, as I said before, what are the plant operation costs that are there regardless of how many units you produce? Fixed, that would be a fixed cost. Fixed cost is a simple way of saying it. As in most things, economists make it more complicated than that. So there might be units that from an accounting perspective you wouldn't consider as fixed costs, but an economist would. You have to be below… If you're below total, average total costs, then you have to offer that additional evidence that predation exists. If you're below average variable costs, then, to put it simply, you get to trial. I would like to shift gears from what the tests are and, you know, what terms mean to a much more specific question, and it deals with the evidence that you, in fact, placed in the record. And here's the question I want to know. Apart from your economist report, now we're not talking about an expert opinion here, what factual evidence was in the record as to the existence of predatory pricing? Well, there was obviously the evidence of their pricing, which was introduced through our economists, but through their own documents in our economists' review. I don't think there was any dispute of that. Okay, can you give me an example of what kinds of pricing were shown in those documents that would constitute predatory pricing? The prices that the predatory pricing itself, Your Honor, and I want perhaps we need to distinguish predatory pricing from predation because I think the predatory pricing is simply their prices and there's really no dispute in the record that their prices are there. Well, I mean, the prices are there and the predatory pricing is a question of what an inference, a permissible inference from the figures. Yes, Your Honor. So what I'm asking is what would be an example or two of pricing figures in the record that you believe could be inferred to be predatory? Well, again, all of their pricing after... Well, why? Because... What? For several reasons. First of all... You mean to the extent that it's lower than what you were charging, that in and of itself permits the inference it was predatory? No, Your Honor, that's never the argument. Okay, so what is it about the price figures that permits the inference that they are predatory? Okay, first of all, the fact that they... We believe the record shows that they were below their total costs. Secondly, the fact that there were these agreements out there with their competitors, which we believe show that here, as opposed to competing with their competitors, that collusion was Gordon's standard way of operating. That gets to the ruling on the summary judgment motion, does it? I mean, not the discovery dispute, correct? It goes to both, Your Honor. Well, I understand, but, I mean, these competitor agreements were not, in fact, in the record. Two of them were in the record, Your Honor, as well as deposition testimony... Because I have two things I wanted to ask you. One is the first thing I ask you, and the second thing I wanted to ask you relates to the content of the competitor agreements. Because we start, and this is partly just a question of how much time I had to put this together, and part of it, I suspect, is a certain degree of murkiness in the record. But we start out with a representation that these competitor agreements don't really relate to pricing of the end product, that they represent that there are agreements with respect to the tool and dye aspect of this. And then later it seems like we're talking about something else, and I'm not sure what the something else is. So while I'm not sure you completely answered question one, if you're shifting to question two and answering question one, I would like at the end of the day for you to have answered both. And I will try my best, Your Honor, and I would just say that... Let them know that the red light doesn't mean that... We have talked before this, and one of the reasons we, and we're not going to allow you unlimited time, don't think, but one of the reasons we started early was we had the time, and then we thought, well, that we were probably going to run over a little in this case. And so... I'm happy to talk until you tell me to stop. Well, I mean, we're not going to, it's not going to go on forever. So the red light should be cautionary, but it doesn't mean we're ready to quit. Let me try to answer your question as succinctly as I can, recognizing that I think your question really gets to the core of the theory of this case, and in some ways it's why, if you read our briefs, it's all like ships sailing in the night. It's like we're talking about two different cases. That's why I'm trying to focus on the factual record as opposed to a lot of... I mean, if we can figure out what the facts are, then I'm pretty confident that we as a panel can appropriately apply the correct legal standards. You're more optimistic than I am. Let me do my best. I'm speaking for myself then entirely. Let me do my best to point you to those facts, Your Honor. I think that the pertinent documents were attached to our opposition to the summary judgment that exhibits, if I'm remembering correctly, E through I. This is exactly what I wanted, okay. And it's difficult because the agreements are in Chinese, and so you have to then refer to a deposition that occurred in a conference room in Taiwan with two translators. I have some difficulty in ascertaining what import is to be attached to them. Your Honor, trust me, nothing in my life will be more complicated than a deposition in Taiwan with arguing translators about what Chinese words mean. But if you look at that deposition carefully, what you will see is... The deposition we are looking at is which one? The deposition is of Mr. Chen, and that is exhibit H and I attached to our summary. All that was in Chinese, really? I'll let the court or its clerks re-approve. The translation is in the... The gist of it is that the two agreements that were produced to us, and I want to make it clear that they were only withdrawn when it was clear that we were entering the market. Those agreements were basically... They were withdrawn. What do you mean? The parties entered into an agreement to end their anti-competitive arrangement when it was clear we were entering the market, and I'll try to explain to you why. They have these agreements with one another. They already had built the tools to build these hoods. They were beating each other up on price, so they decided only one of them would make the hoods. They enter into these agreements, and the way the agreement is structured is one of them will stop manufacturing the hoods. I'll put away my tools that I've already invested in, and I will then... The other party will manufacture the hoods. Well, how am I going to ensure that I get a high enough price or I don't get cheated out of this? We're going to agree that there's a pricing floor as part of this agreement. So as part of the agreement, the party that manufactures has to sell all the hoods to the other party above this floor, and then any that are sold in the United States have to be sold above that floor, and there's a penalty provision. What difference is to be drawn from the agreements if they didn't pertain to the time period when your client was in the market? Because they are only withdrawn when they saw that our client was going to get in the market, and their whole arrangement won't work if there's someone selling below their cost because they've structured this agreement to create a floor at how low they can price in the United States. I'm still not sure. Go ahead. I understood you to say that these agreements, which you have deemed, I guess, anti-competitive, because they were amongst each other and they colluded to do this activity at a price and through an arrangement that would ensure each one of them had a certain profit. When PBSI came in, PBSI is not a part of that agreement, so PBS can come in and set their price. These individuals then revoked those agreements or disallowed them and then started selling at a price below where PBSI came in. Is that what you said? Yes, that's what I'm saying. Were they already selling at a price below where PBSI came in? No, before we came in, they were selling at a price that was way above competitive pricing. I think that their position, if I understand from the defendant's brief, is that that's not exactly the case, that PBSI's pricing was pretty much consistently higher than Gordon's pricing, both at the time it entered the market and prior to Gordon's, and that there was never really, that their prices were always lower. We don't think that the record supports that. Certainly, that wasn't the basis for summary judgment below. At best, I think that's a factual issue for a trial. So, Your Honor, have I answered your question? Not really, because I don't see, I mean, I can see how the agreements certainly provide a lot of evidence about what the arrangements were among all these Taiwanese corporations prior to your entry into the market. I can understand that they permit an inference about what happened upon your entry to the market. I don't think they permit an inference then about what happened during the period. I'm not seeing how they permit an inference during the period when you were actually in the market. And, Your Honor, I think the, first of all, I think what's relevant when we were in the market is that we see the Taiwanese folks, and Gordon in particular, trying to drive us out of the market so that they can reenter into these kind of agreements. And that's why our request for discovery. They certainly might have hoped you wouldn't be a competitor anymore. So, what did they do? They addressed, they ended their agreement that kept the prices high. They drastically lowered their price, we believe, below at least their total cost, if not below their average variable cost, in order to drive us out of the market. I believe you have evidence of that with respect to total cost, but I think you told us earlier you were unable to get evidence with respect to the variable cost. We would concede that our economist's opinion was, with the discovery we were granted, was unable to opine that we got below average variable cost. And I want to ask, you said that there were specific errors made with respect to discovery issues that significantly, I guess, disadvantaged you and that were erroneous by the trial. And I want you to just kind of quickly talk about those specific discovery issues. And I think in there, there are some times where it appears that PBSI, if not sat on their rights, did not move diligently to challenge those decisions at the time they were being made by the magistrate judge or whomever. So talk about the specific and discreet discovery decisions that you believe were clearly erroneous. Sure, Your Honor, and with your permission, I'll also address your concern about whether we were vigorous in protecting our rights. With respect to the discovery, there's really two areas. The first of them is our request for discovery regarding agreements that Gordon had with its competitors and an issue that just we repeatedly made in the district court that the district court completely ignored, which was requests for notes of admitted meetings that occurred between Gordon and its competitors. After the fact. Throughout the whole period, there was testimony in the deposition that Gordon was regularly, on a monthly basis, meeting with its competitors. We, through another source, got one copy of those minutes. We produced them to the court, and the court completely ignored, in all of its decisions, our requests so that we could understand ongoing meetings between Gordon and its competitors. Where would we find the notes of that one meeting in the record? Because apparently that was the basis for the magistrate judge to determine that, and ultimately the district court to determine that further discovery on that point was not needed. Your Honor, I believe that in our supplemental memorandum in support of our motion to compel, we attached those meeting minutes. Again, they're in Chinese. But, again, I just want to be clear, Your Honor, the court never addressed it. I mean, we, in our briefing, repeatedly pointed out that the court was ignoring this issue, and I don't think you'll find anywhere in the court's decision that it ever addressed our arguments about these meeting minutes. Well, is there anything we can determine from which we can determine the content of the notes since, as far as I know, no member of the panel reads Chinese? Well, yes. My examination of Mr. Chen and the attachments. So that is also included in the Chen deposition? Yes, and it would be in either or both the attachments on the supplement to the motion to compel and in our opposition to the motion for summary judgment. The notes were made after you came into the market? I'm sorry? The notes were made after you came into the market, your company? Yes, Your Honor, and the testimony was that those meetings continued. I think that I took the deposition in 2008. And you were denied discovery of those? That's what you're saying? Yes, Your Honor. As well as any agreements that were made, either other than the limited number before or after you came in? Is that what you're saying? Correct. The notes of that one meeting discussed pricing? They discussed cost, which were part of the pricing formula. Your basic argument is you can't really make out your case unless you get these notes and unless you get these agreements and you're able to examine them and argue based on inferences that you can make from that kind of information. In other words, you were denied the opportunity to fully make your case because of the absence, because you were not allowed to pursue this type of evidence. Your Honor, I think with the emphasis on the word fully, I believe that we still survived summary judgment with the evidence we presented, but we believe that going to trial, this kind of discovery is exactly what you would be entitled to and it would allow us to fully paint this picture of the predation that the courts ask about and to fully explain to the jury. To continue, Judge Donnell, with your question, the areas beyond that where we were seeking discovery was these agreements, which the court, and I would say the court later read its first decision to say that it had ruled that you're not entitled to all the agreements that Gordon had with its competitors. I can't read that decision no matter how hard I read to say that. I don't find that it says that. I didn't understand it at the time. And the court never found that we had waived that argument when we later raised that question with the court. There's no burden to the defendant in producing those. They, in fact, testified that they'd already gathered them, but the court nevertheless found that these agreements, which related conceitedly, according to Gordon, didn't relate to the four hoods we're talking about here, but did relate to hoods that they were manufacturing in the same plants, selling to the same folks. And we're talking about 100 agreements with competitors. We're talking about a standard way of operating where you agree with your competitors rather than compete with them. Can I ask just one factual question? Yeah. Do you understand there to be any agreements with competitors that post-date your entry into the market? Our understanding from Mr. Pan's declaration, which is attached to our motion for summary judgment and was originally proffered by Gordon, was that these agreements were on an ongoing basis. They were Gordon's standard operating procedure, and part of his argument in his declaration was it would disadvantage Gordon if we couldn't enter into these agreements anymore. Okay. I have a question I'm sorry to say. That is, if you're right about being improperly denied the evidence of these notes and agreements, then what should be the ruling of this court not only about that issue, but what should then be done about the case? Well, you know. Follow that question? I follow the question. In an ideal world, you would reverse the discovery decisions and explain the standard that the court should have applied under the Daubert rulings and under summary judgment. I realize that courts make judgments about how far they want to go in a decision and whether you want to reach all of the issues on summary judgment or simply want to send this back for further discovery I think is within the discretion of this court and really a judgment the court has to make. I obviously love clarity as I go forward and think it's beneficial. I wanted to add something. Yeah, I did. You know, in your initial discovery request, the court narrowed that considerably and said it required Gordon to produce some information from which a representative sample of documents could be obtained, and then there was an inspection, and the court said that they didn't really find that there were any inaccuracies in what Gordon submitted and what you were, I guess, asking for or alleging. And I think there was something like 1,500 or 1,000 documents in whatever that initial submission was. So if the court, you don't argue that a sampling mechanism was an appropriate way for the court to view that, do you? No, Your Honor. I mean, if I understand your question correctly, I'm not arguing that a magistrate can't try to reduce the cost of discovery by staging things, in effect, and saying produce documents for a certain period of time and let's see if there's relevant information there before we go and ask you to produce it for all that time. In fact, that's why, from my point of view, there's no argument. Is relevant information or information likely to lead to the discovery of relevant information? Isn't that the way the rules frame it? Yes, Your Honor. I appreciate that it's a broader standard than I articulated. And that's, I think, exactly what the magistrate did in the first decision. What we assert that he did, though, was not say that the only way we could get additional documents at that phase was to show that there was something inaccurate in Gordon's cost calculations. What we did, in fact, do was attach the Mickelson Declaration to our renewed motion to compel. And it showed that there was additional information in what had been produced that would be useful to an expert. Dr. Mickelson is a colleague of our testifying expert. And, in fact, when Dr. McFarland did his report, he relied on some of those additional materials for the periods for which we had them. So what we are asserting, and this is on the cost discovery side, not the agreement discovery side, if we can make that divide, that the court, in effect, later on shifted the burden to us to only allow us discovery if we could use specific documents in there to prove one thing. Whereas, as the court stated, the standard is likely to lead to the discovery of admissible evidence. And what was in there was documents that gave a broader picture of cost that we think would have given a broader scope to Dr. McFarland's ultimate report and allowed him to make, we believe, the conclusion that, in fact, the pricing was below average variable costs, not just below average total costs. Okay. We'll hear from you in rebuttal. Thank you, Your Honor. Gallinger. Thank you, Your Honor. Good morning. May it please the Court. My name is Scott Ballinger. I'm here representing the Appellee Gordon Auto Body Parts. So the panel has discussed a lot of questions. I'd be happy to try and help answer them if I can. Let me ask one or tell you. I've got a serious problem with denying the discovery of the agreements and the notes because if there's going to be evidence of collusion, that may be a good place to look for it or the inferences to be made. So why? And your objection to the discovery seemed to be from the beginning, basically, that it was irrelevant. That was the label put on it. This is irrelevant. It shouldn't be discovered. And where you have a group of defendants here who appear at least to have a history of making agreements among themselves, why should not those agreements both before and after the plaintiff came into the picture and the notes, why should they be excluded? Well, Your Honor, I think it's important to recognize what we're really talking about here. They got the only two agreements that relate to the markets that they have alleged in this case. Well, shouldn't they be able to make the decision themselves rather than you making it for them as to which agreements say what and how they may or may not be relevant, including the notes? Well, Your Honor, on the agreements, we didn't make the decision for them. The district court, in the exercise of its sound discretion, made the decision for them. Didn't you argue for the position the district court took? We argued for what the Supreme Court said in Matsushita, which is that an agreement in another market has little or nothing to bear on inferences in this market. And before we leave the meeting notes, I think it's very important to say that I'd love to come back to it. When we talk about the meeting notes, there was not a determination not to produce them. Maybe you could do this first and then answer his question first and then talk about what you want to talk about. So what we're talking about are joint venture agreements in other markets that are not at issue in this case. We argued, as the Supreme Court held in Matsushita, that you can't infer much of anything from the existence of agreements in other markets about what's happening in this case. Does that have to do with the whole recoupment issue and the theory asserted by the plaintiff that when you're talking about recoupment, you can look at markets other than the market you're in? I thought what it had to do was their argument that it will be possible to recoup in this market because these defendants have talked to their competitors and had joint ventures with them in the past. We can assume that they will collude unlawfully to raise prices in this market later. So you don't think there's any part of this case that relates to the other agreements? Absolutely not, Your Honor. That's what the district court held. Even an arguable theory? In Matsushita itself, the facts were that it was conceded that the defendants had a minimum price-fixing cartel in Japan as to the very televisions that were the subject of the Matsushita case. And the allegation was that they were using the profits from that cartel to finance a predatory pricing conspiracy in the United States. And the Supreme Court of the United States said that says little or nothing about the plausibility of a conspiracy in the United States on the same products. Was the ruling there denying discovery of any of that information? Is that what the ruling was? No, the Supreme Court was simply saying it's not probative. It doesn't tell us anything. But they had the information before them. They had it in the Supreme Court sentence. But we don't have the information before us. We can't make that decision until we see what the information is, right? Your Honor, I think that what the magistrate judge and the district court in the exercise of their sound discretion said in this case is that nothing that the plaintiffs have alleged about these agreements suggests that it's going to lead to useful, admissible, relevant evidence in this case. They didn't have any information before them like the Supreme Court did in the case you're talking about. Well, of course not. They didn't have the information to look at. The Supreme Court did. Your Honor, they had the only two agreements that are relevant to the actual markets that are alleged in this case. They deposed Mr. Pan. Is Mr. Pan's declaration inconsistent with what you've just said in any way? I mean, the position is he somehow admitted that the agreements that they claim are relevant exist. Well, Your Honor, I believe we've never contested that there are joint venture agreements in other markets. There's nothing unlawful about that, Your Honor. I understand that. But does Mr. Pan suggest that in any way they relate to this market? No, absolutely not. There are two agreements that related to this market prior to any of the events that are at issue in this case. They were produced and they cross-examined Mr. Pan, deposed Mr. Pan about them at his deposition. On the subject of these meeting notes requests, Your Honor, this is a quintessential phishing expedition. They asked for any information of any kind as to meetings or correspondence between the defendant and the other Taiwanese companies. And if you look at Record 45-3, page 445, you'll see our response in discovery, which is that as to the markets at issue in this case, there simply are no such communications. And so how, for purposes of this litigation, because you're making the determination of what documents there are that do or do not relate to the market, how are you defining, how narrowly or broadly are you defining the term related to, for purposes of the market? I mean, you know, he says that there are. I mean, are you saying that there has to be a direct, I mean, does related to mean a direct connection? Does it mean perhaps an indirect where there is an influence in this market? What does it mean? No, there's no dispute among the parties about what the relevant markets are. The relevant markets are the U.S. markets for the four hoods in question. No, no, not the relevant market. I'm saying how are you defining whether or not something is related to this market? Is it a direct connection? Is it an indirect connection? It's an agreement concerning these products, Your Honor. So for instance, can I give you an example, Your Honor? So my client makes thousands of auto parts. And in any other market, say this case is about hoods, say there's a separate market for, you know, fender panels or whatever you want to call it. There are agreements in which companies get together and, for instance, they agree to share the cost of new tooling, which is expensive. And they agree that they're going to have a joint venture to produce tools together. Relative to that part. A tooling agreement relative to fenders has nothing to do with the market for Ford F-150 hoods. And that's all that the district court recognized. And if I may, Your Honor, I think it's very important to recognize that all of this is a sideline. It does not help them to show, even if they could show, that there was some sort of tendency to agree among this market. Collusion, we call it, right? Your Honor, they still have a fundamental failure of proof on the most basic element of their claim, which is below-cost pricing. They have no proof of pricing in this case below any appropriate measure of cost. And that includes average total costs in the case, Your Honor. So they should be denied the discovery because their proof on costs is either, you say, non-existent or weak. They should be denied this discovery because of that. Well, Your Honor, they've raised a lot of claims. And if you want, maybe we'll have to whiteboard them out because there are different elements of various claims. And all of them require them to prove pricing below an appropriate measure of cost and a likelihood of recoupment. The point would be not that that fact justifies the result of this discovery motion but that if this discovery motion had been granted, there would have been no information bearing on cost. And they're still required to prove cost. And, therefore, that element of the claim fails. And that's determinative of whether summary judgment was appropriately granted. That's absolutely right, Judge. So that's the—so, I mean, you don't mean to say to Judge Merritt that that has anything to do— I mean, if this request should have been granted, it should have been granted. I mean, the point is that if it had been granted, it still wouldn't correct what you think is the fatal flaw in the claim. That's absolutely correct. The whole dispute among the parties about these joint venture agreements and other markets goes only to the case that they would like to make as to likelihood of recoupment. There is a separate element, required element, of a predatory pricing claim that you have to show pricing below an appropriate measure of cost. They hired an economist— Before you can get to discover things, you've got to show that in advance of anything having to do that might raise an inference of collusion or recoupment or any of those things, right? Is that what you're saying? No, Your Honor. Obviously, discovery usually happens before summary judgment. But if their claims fail as a matter of law at the summary judgment stage for a reason that has absolutely nothing to do with the discovery that is in dispute, then it's harmless error. There is no path to reversal because the defendant was entitled to summary judgment for a reason that the discovery issue is irrelevant to. And I would love to talk about it because they hired an economist, Dr. McFarland, paid him a lot of money, and asked him to analyze this market, and he would not opine that Gordon was pricing below any appropriate measure of cost. Gordon is not pricing below any appropriate measure of cost. All that their own expert would say is that Gordon's pricing is aggressive. It's close to cost. Did he say anything about in order to do that he would need additional information of a particular type or kind or source in order to be able to affirmatively make such a claim? He said that there was additional information that he would like to have relating to cost, and that's a separate discovery issue that we'll talk about in a minute. That would be the first of the three, whether the sampling was appropriate. Yes, absolutely, Your Honor. So, but I think it's important to start from an understanding that this Court and the Supreme Court have said unequivocally that you cannot have a predatory pricing claim unless you can prove pricing below cost. Now, this Court has said that usually the appropriate measure of cost in a predatory pricing case is average variable cost. Both experts below agreed that this is the sort of market that average variable cost is what it's appropriate to look at. So they could not get their own expert to study average total cost. You're saying that whatever may happen in this case, they can never prove that the costs in this predatory pricing case are below the requirement, which is the average variable cost. There is, under this Court's case law, just to be clear, this Court has not taken the Supreme Court's invitation, very strong invitation yet, to close the door on all predatory pricing claims where pricing was above average variable cost. The Supreme Court's dicta in Brooke Group is very strong that that's the right rule. But this Court has left some possibility that in the zone between average variable cost and average total cost, it might be possible to make out a claim if you can show that it's the right kind of market for that to be the right standard and that there is no objective justification for the defendant's pricing other than driving the plaintiff from the market and then subsequently raising prices later. But they have not forwarded that theory in this case. Their expert refused to opine about whether their pricing was below even average total cost. I would urge the Court to read their expert's opinion with care. All it says is that pricing was close to cost and aggressive. That's assuming that the expert opinion were admissible in its entirety. Yes, Your Honor. That's assuming that the District Court had not excluded a portion of it. That's absolutely correct. But the District Court didn't exclude the cost analysis. And the cost analysis issue is absolutely fatal. And if you really look at what they're arguing, what they're arguing is that they should be able to make out a predatory pricing claim because Gordon's pricing was aggressive, close to its cost, and below what their expert regards as the profit-maximizing level. We should have charged more because, in his opinion, we would have made more. That is exactly the theory that this Court rejected in D.E. Rogers and Arthur S. Langenfelder and the Supreme Court rejected in Brooke Group. In the Langenfelder case, this Court said, we are not going to get into the business of second-guessing for industrial organizations what their profit-maximizing price would have been. That is a nightmare for courts and for litigants. You have to understand the demand side of the market. You have to make value judgments about short-run versus long-run profit-maximization. I certainly accept that. It's a disaster. So they have two arguments. And, Judge Gibbons, I believe you asked a question about whether there's evidence in the record other than the expert report, which pointedly declines to find any below-cost pricing. What you're really suggesting is that we should go about this case and we don't have many cases like this, so we have to get our minds back in this subject matter, by saying, is there any cost evidence that would indicate this is predatory pricing? Is the cost evidence all consistent with everything showing above-cost pricing? Absolutely, Your Honor. And if we decide that the evidence is sufficient to show that everything is above-cost pricing and no errors have been made in what they were able to discover with respect to cost, that we should end the case. My client is unambiguously entitled to summary judgment and there's no reason for this case to proceed. Judge, can I ask you, I just kind of want to lay out for you where I think we are in terms of the critical questions in the case. And if Mr. Wilson can cover this in his rebuttal or cover anything he thinks you misstated or I misstated, I'd like to know. Looking at Section 2 of the Sherman Act, we've got to find price below an appropriate measure of cost. To decide that, we look at the evidence in the record, plus we look at the test outlined in SPIRT. Is that right? That's correct. That's why I was asking the questions about what evidence of cost were in the record. And it's also actually why I was asking all the questions about the competitor agreements because I couldn't figure out to what extent, if any, they related to cost. You're not. And I understand that's your position. Then the second element under Section 2 would be either a reasonable prospect for the Robinson-Patman Act or the dangerous probability for the Sherman Act of recouping the investment in below-cost prices. Your position is we don't even get there because Element 1 cannot be shown. That's absolutely right. And let me just add the amendment that also under Section 2, you have to show monopoly power. That's kind of a prelude to all this, right? Right. And it's undisputed. What I was asking you about was really the down-the-road question, not all the monopoly power, the willful use of that power, the intent, all those things. Those come before the nitty-gritty I was asking you about. That's right, and I just want to put down a marker. No, you're quite right. And I understand you can— I think that we are independently entitled to summary judgment on that ground, Your Honor. I believe it is undisputed in the case. But the nitty-gritty is what we were just talking about. Okay, right? I don't know, Your Honor. I think that our client is entitled to summary judgment on just about every element of—if not, I think, actually every element. Right. Well, I mean— I would be happy to accede to the Court's framing of the issue. Thank you. Now, for Section 1, we're looking at what the defendant did in concert with others, correct? Well, Your Honor, there are a number of requirements, and this is actually one of the most— I'm not saying that's the only requirement. I'm saying that that's what we're looking at, correct? Well, I think you have to look at all of the requirements. One of them is— But one is—one is related to—relates to a contract combination or conspiracy in restraint of trade. And therefore, the defendant is alleged to be acting with others. I'm not purporting to say what else the defendant has to be doing, right? One element of a Section 1 claim in this context is an agreement. All right. So, the content of the competitor agreements and notes and that sort of thing becomes very important as far as the Section 1 claim is concerned. And kind of as a preliminary matter, we have to answer the question about the discovery of the competitor agreements to know whether the plaintiff was deprived of information that would have been helpful in connection with establishing the Section 1 claim. Is that right? I just want to be clear that they got every single agreement that related to the markets that are— I understand that's your position, but that's where that's—I'm just trying to figure out where it's pertinent in the analysis. And that's where it would be pertinent in the analysis. But then, even if you got past that point, then you hit the brick wall of proof of below-cost pricing, as I was going to say. And so, the elements of the Section 2 claim, the predation and the recoupment, are both somehow wound in to a Section 1 claim. But it's a little unclear to me as to how that is. It's an extremely interesting issue that I'd love to talk for a few minutes about, Your Honor. Well, don't talk for too many minutes about it, because we need to get to Mr. Wilson's rebuttal. I understand. So, one of the most interesting disputes between the parties in the case legally, I think, is that they have taken the position that you can have a predatory pricing conspiracy without predatory pricing. That all you have to do is show an agreement among competitors to charge low prices, and that's enough. The Supreme Court in Brooke Group was very, very clear that, quote, low prices benefit consumers regardless of how those prices are set. We have adhered to this principle regardless of the type of antitrust claim involved. Quoted Adam Smith, right? Maybe so. That's 509 U.S. at 223. We understand that. That's why these cases are peculiar, these predatory pricing cases, because normally low prices are good. Yes. Regardless of the type of antitrust claim involved, low prices are good for consumers. And then on the next page, page 224 of Brooke Group, the second prerequisite for holding a competitor liable under the antitrust laws for charging low prices is recoupment. The Supreme Court has been very clear that whatever your theory is under the antitrust laws, if it depends on the charging of low prices, you have to show below-cost pricing and recoupment. So we look to Brooke to see how both predation and recoupment figure into the analysis of the Section 1 claim. That's all I want to know, yes or no. Yes. Okay. I'm done. Okay. Anybody got anything else? We could stay here all afternoon and discuss this, and maybe after we look into the case further, it would be well to have another argument, but I'm not going to suggest that. Well, Your Honor, could I address just the discovery cost issue? Because I think that it's actually the— I think maybe the thing to do right now is to say thank you for the opportunity to have argued exceeding my time. All right. All right, Mr. Wilson. And we're not going to be—we're probably not going to be as generous with the overtime this time, just to warn you. So you might try to tailor your remarks to take in maybe not very much more than the four minutes you had. I'm going to try to be as brief as I possibly can, Your Honors. First of all, with respect to Gordon's assertion that it's conceded that there's no evidence of below-average total cost pricing, we dispute that, and we have addressed that at pages 10 and 11 of our reply brief. And so I'll rest on our reply brief for that. But we certainly dispute that. Secondly, with respect to Your Honor's question, I believe you've properly stated the elements of a Section 2 and a Section 1 claim. But when you're talking about a Section 2 claim, recall that there is the conspiracy clause in Section 2 of the Sherman Act, which contains different requirements. And, in fact, we would concede that that's the focus of our Section 2 claim is on a conspiracy. We are not asserting that broadly conceived that Gordon is without competitors. What we're asserting, though, is that it de facto becomes a monopolist when it enters into an agreement with its only competitors that they're not going to produce the part anymore. That's a monopolist, right? Well, that all happened prior to the time you entered the market, and they don't do that anymore. And it seems to me that in order for you to get beyond that, there's got to be some indication that these agreements we're talking about relate to the particular market in which you're attempting to compete. Your Honor, I would urge the Court to take a careful look at Exhibits H and I to our opposition to summary judgment, look at the testimony as to when those agreements were abandoned, and we believe that there's at least an inference, if not more, that a jury could rely on that the abandonment of this monopoly agreement occurred when they saw us entering because they realized the structure of their monopoly wouldn't work with our entry. So, I won't say more about that because I think it's in our briefing. I think you're wise to recognize that at this point we've got a lot of questions, and we're going to have to try to answer them. Yeah, the question, you know, is how the judges here or ours should go about thinking about this. And your opponent's position is, well, you just fail on cost. You've got no real showing, and none of the discovery you seek could illuminate this further. You've got no showing of below-cost pricing, and that ends the case. You don't need to go look for collusion, et cetera. First of all, that's not even the basis that the district court granted summary judgment on. Well, we don't have to be bound by the district court. I understand that, but the district court made no finding that that was the case. My understanding was based on his argument here. Did you understand that to be his argument or not? I did understand that to be his argument. Okay, well, that's why I asked the question. And as I pointed out on pages 10 and 11 of our reply brief, I think we explain very specifically why the assertion that we didn't offer evidence raising a genuine issue, a material fact, the standard here, as to whether prices were below average total costs is untrue. Very briefly, you look at their prices. They were 91 to 126 percent lower after we entered. Their prices before were 91 to 126 percent higher than they were after we entered. If you look at Dr. McFarland's report carefully and his deposition testimony, which they mischaracterized, he never conceded that he did not have the opinion that their prices were above average total costs. His testimony is you should look at the references. He just said he didn't know because he couldn't. Because he had been limited in the discovery. Any likelihood that the discovery on agreements, notes, et cetera, would cast any light on anything other than the question of collusion, that is, would cast any light on costs? We believe that, yes, that there is because the agreements specifically contain agreements about how you're going to characterize costs as part of this overarching conspiracy with one's competitors. And along those lines, Gordon relies heavily in its argument on Matsushita.  In Matsushita we're talking about the argument that a conspiracy in Japan relates to a conspiracy with a different objective in the United States. Here we're talking about a conspiracy where it's undisputed that Gordon is selling a whole range of hoods and the only difference between them is which pickup they fit on. And they know that there's the prospect of us entering all of these areas of hoods and they're all being sold to the same customers for resale. So the idea that Matsushita here says that that wouldn't be relevant evidence at a trial, let alone that Matsushita says that you can't discover that information, is simply incorrect. I will just close, Your Honor, because I've exhausted your patience, I'm sure, with I would urge the Court to review the District Court decision in the Solyndra case that we cited in our brief that is the one case that we have found that very specifically addresses how to apply these concepts in a Section 1 case. And we think it would provide valuable guidance for the Court's thinking. We appreciate both of you sharing your extensive thoughts about this case this morning and enduring well under our extensive questions. And we'll certainly devote our most serious and careful consideration to the case. Thank you, Your Honors. All right. The Court may call the hearing.